UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————— x
INDIANA PUBLIC RETIREMENT SYSTEM, :    Civil Action No.   1:25-cv-09234
on Behalf of Itself and All Others Similarly  :
Situated,                               :    <u>CLASS ACTION</u>
                                 :
             Plaintiff,    :    COMPLAINT FOR VIOLATIONS OF
                                 :    FEDERAL SECURITIES LAWS
   vs.                            :
                                 :
LANTHEUS HOLDINGS, INC., BRIAN    :
MARKISON, PAUL M. BLANCHFIELD,    :
ROBERT J. MARSHALL, JR., and AMANDA   :
MORGAN,                          :
                                 :
            Defendants.    :
                                 :
———————————————— x    <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Indiana Public Retirement System ("plaintiff") alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Lantheus Holdings, Inc. ("Lantheus" or the "Company"), the Company's press releases and conference calls, and analyst reports, media reports, and other publicly disclosed information about the Company.  Plaintiff believes that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1. This securities fraud class action complaint is brought on behalf of all purchasers of Lantheus common stock between November 6, 2024 and August 6, 2025, inclusive (the "Class Period"), against Lantheus and certain of its senior executives (collectively, "defendants") for violations of §10(b) and §20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 10b-5 promulgated thereunder.

2. Lantheus presents itself as a sophisticated medical technology company driving innovation in radiopharmaceuticals.  Its flagship product, Pylarify, a prostate-specific membrane-antigen ("PSMA") PET imaging agent, is the Company's dominant source of revenue and earnings.  Throughout the Class Period, defendants portrayed Lantheus as a diversified, data-driven company with multiple growth drivers, long-term contracts, and deep understanding of market dynamics.

3. In reality, Lantheus' success was almost entirely dependent on Pylarify, which generated the vast majority of revenue.  Internally, defendants knew that the Company's "diversification" narrative was false, that its forecasting processes were unreliable, and that management had materially underestimated the pricing and reimbursement risks created by a

Centers for Medicare & Medicaid Services ("CMS") rule shifting hospital reimbursement for Pylarify from Average Sales Price ("ASP") to Mean Unit Cost ("MUC") rates, reducing hospital payments by roughly 45%.

4.  Rather than disclose the serious negative implications of that change, defendants repeatedly assured investors that CMS had decided to "pay separately for specialized diagnostic radiopharmaceuticals" – suggesting reimbursement stability for Pylarify – that the Company's "strategic partnerships" secured stable, multi-year pricing, and that competitive pressures were "minimal."

5.  Defendants were motivated to conceal Pylarify's deterioration to maintain Lantheus' inflated stock price while completing the Evergreen Theragnostics, Inc. and Life Molecular Imaging Ltd. acquisitions. Those transactions, and a concurrent $400 million share repurchase authorization, depended on sustaining investor confidence and a high market valuation.

6.  Investors began learning the truth in May 2025, when Lantheus disclosed disappointing results and downplayed the problem as "temporal competitive disruption." By August 6, 2025, the façade collapsed: Lantheus announced an 8% year-over-year decline in Pylarify revenue, revealed that price and mix had deteriorated by roughly 10%, slashed its full-year guidance, and admitted to widespread contract renegotiations and account losses. These revelations triggered a one-day stock price drop of nearly 29%, erasing hundreds of millions of dollars in shareholder value.

7.  Defendants' misconduct deceived investors about the Company's dependence on Pylarify, the reliability of its internal forecasts, and the true state of its pricing and competitive position. Although the new CMS reimbursement methodology technically applied to only about one-fifth of Pylarify's scans – those billed to traditional Medicare fee-for-service patients in

hospital outpatient departments – it served as the reference point for pricing across the entire market.  Once hospitals began receiving roughly $337 per millicurie (a practical unit for measuring the activity of a radioactive substance) under the new MUC formula, they and other providers demanded contractual price concessions.  Competitors also used the lower benchmark to deepen discounts.  These cascading effects rapidly compressed Pylarify's net price across all payer segments, revealing that the product's profitability and growth were far more fragile than defendants had led investors to believe.  The market's recognition of this vulnerability, and of management's misleading assurances of reimbursement stability, caused a sharp decline in Lantheus' stock price when the truth emerged, inflicting substantial damages on investors.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa, as the claims asserted herein arise under and pursuant to §10(b) and §20(a) of the 1934 Act, 15 U.S.C. §78j(b) and §78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

9.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act, 15 U.S.C. §78aa, because Lantheus common stock is traded on The Nasdaq Global Market ("NASDAQ"), which is headquartered in this District, and many of the acts and transactions alleged herein, including the dissemination of materially false and misleading statements, occurred in this District.  In addition, defendants' wrongful acts had a substantial effect in this District, where numerous investors purchased or sold Lantheus securities.

10.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## PARTIES

11.    Plaintiff Indiana Public Retirement System purchased Lantheus common stock at artificially inflated prices during the Class Period and suffered damages as a result of defendants' alleged misconduct, as set forth in the certification attached hereto and incorporated by reference herein.

12.    Defendant Lantheus' common stock is listed and actively trades on the NASDAQ under the ticker symbol LNTH.  As of August 1, 2025, there were over 67.9 million shares of Lantheus common stock outstanding.

13.    Defendant Brian Markison has served as Lantheus' Chief Executive Officer and a member of its Board of Directors since 2019.  As CEO, Markison spoke on Lantheus' behalf in press releases, conference calls, and SEC filings during the Class Period.  Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Markison certified the accuracy of Lantheus' periodic reports filed with the SEC, including the Company's Forms 10-K and 10-Q issued during the Class Period.

14.    Defendant Paul M. Blanchfield served as Lantheus' President throughout the Class Period.  Blanchfield regularly participated in investor communications, earnings calls, and press releases concerning Pylarify's performance and the Company's revenue guidance.

15.    Defendant Robert J. Marshall, Jr. served as Lantheus' Chief Financial Officer and Treasurer throughout the Class Period.  In that role, Marshall was responsible for Lantheus' financial reporting, internal controls, and public guidance.  Marshall participated in the preparation and dissemination of the Company's financial statements and other public filings with the SEC and certified the accuracy of those filings pursuant to the Sarbanes-Oxley Act of 2002.

16.    Defendant Amanda Morgan served as Lantheus' Chief Commercial Officer during the Class Period.  Morgan was responsible for commercial strategy, marketing, and contracting for

Pylarify and other Lantheus products.  Morgan spoke to investors and analysts on earnings calls and in presentations during the Class Period.

17.     Defendants Markison, Blanchfield, Marshall, and Morgan are sometimes collectively referred to herein as the "Individual Defendants."

18.     During the Class Period, each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential and proprietary information concerning the Company, its operations, business prospects, and overall financial condition.  By reason of their positions within the Company, the Individual Defendants obtained, had access to, and/or were in possession of material, adverse nonpublic information concerning Lantheus via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board meetings (and committees thereof), and via the reports, presentations, and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.     As senior executive officers and controlling persons of a publicly traded company whose common stock was and is registered with the SEC pursuant to the 1934 Act, and was and is traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, business, financial statements, and financial metrics, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Lantheus common stock would be based upon truthful and accurate information. Defendants' materially false and misleading misrepresentations during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various

SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

21.    Throughout the Class Period, defendants made a continuous series of false and misleading statements designed to reassure investors that Lantheus' pricing, reimbursement, and market position were stable and that management possessed reliable forecasting insight.  Each statement was materially false when made and was issued with knowledge or reckless disregard of contrary internal information.

22.    Before the CMS 2025 Final Rule was released, diagnostic radiopharmaceuticals like Pylarify were at risk of being "packaged" into the overall hospital outpatient payment, which would have eliminated any stand-alone reimbursement line.

23.    CMS' 2025 Hospital Outpatient Prospective Payment System ("OPPS") Final Rule (CMS 1809-FC) was publicly released on November 1, 2024 and formally published in the Federal Register thereafter (89 Fed. Reg. 93912 (Nov. 27, 2024)).  Addendum B, which lists the final payment rates for all outpatient codes (including the radiopharmaceutical codes such as A9607 – Piflufolastat F-18 (Pylarify)), was posted on CMS' website.

24.    On November 4, 2024, Jefferies Equity Research published a report titled "CMS '25 Payment for PYLARIFY Better Than Expected," which stated that "LNTH has confirmed that

for patients with Medicare FFS that are treated in the hospital outpatient setting, the calendar year 2025 payment rate for PYLARIFY is the same as the current PYLARIFY payment rate (per CMS's Addendum B)."

**November 6, 2024**

25.     On November 6, 2024, following CMS' publication of its final CY 2025 OPPS rule, defendants told investors during Lantheus' Q3 2024 earnings call that CMS had "maintain[ed] separate payment" for specialized diagnostic radiopharmaceuticals.  Thereafter, Jefferies Equity Research reiterated its November 4th comment, in bold, that "LNTH noted the PYL CY25 payment rate is found in Addendum B and is the same as its current payment rate."

26.     These statements were materially misleading.  CMS CY 2025 OPPS Final Rule, released November 1, 2024, maintained a separate line-item payment for diagnostic radiopharmaceuticals but changed the methodology for hospital outpatient Medicare fee-for-service patients to MUC, setting Pylarify's rate at $337 per millicurie, about 45% below the prior ASP-based level.  The separate-payment designation applied only to roughly 20% of Pylarify's volume; the remainder (commercial and Medicare Advantage accounts) was unaffected. Defendants nevertheless told investors that CMS had "maintain[ed] separate payment," implying reimbursement stability when in fact the change materially reduced hospital margins.

27.     Also on November 6, 2024, during the Q3 2024 earnings call, defendant Blanchfield stated that Lantheus was "well positioned to continue as the clear market leader in PSMA PET imaging and sustain Pylarify as a $1 billion franchise in 2025," and asserted that "the net price impact of our recently secured strategic partnerships . . . [reflects] our ability to maintain a price premium versus that of our competition."

28.     These statements were materially false because the "strategic partnerships" referenced were discount contracts executed to offset the reimbursement loss under MUC pricing.

Internally, defendants referred to these deals as "price-compression agreements." By characterizing them as evidence of pricing strength, defendants misled investors about the direction of Pylarify's net price and the stability of its revenues.

**November 20, 2024 – Jefferies London**
**Healthcare Conference**

29.    At the Jefferies London Healthcare Conference, defendant Marshall told investors: "These are long-[term], these are multi-year contracts that would benefit both parties with keeping PYLARIFY as a market-leading product with pricing that is premium to its competition."

30.    This statement was knowingly false. By November 2024 Lantheus had already modeled a 5% sequential price decline and knew that the contracts Marshall referenced included substantial upfront price cuts and rebate provisions.

**February 26, 2025**

31.    Once MUC pricing took effect on January 1, 2025, defendants continued to minimize its significance. On February 26, 2025, Lantheus issued full-year guidance projecting 2025 revenue of $1.54 billion to $1.61 billion and stated that "we expect PYLARIFY to grow low to mid-single digits on a net basis," adding that Lantheus was "well positioned to grow PYLARIFY and DEFINITY." That same day during the Company's Q4 2024 earnings call, defendant Markison responded to an analyst's question about Pylarify pricing that "our strategic contracts are in place with the vast majority of our customers" and "we're very comfortable" with the strategy "set in motion over a year ago," and that "the fact that we have an MUC and have a separate payment is really upside to what we were originally thinking and planning."

32.    These statements were materially misleading. By February 2025, internal reports showed hospital resistance to price increases and early contract renegotiations caused by the MUC reimbursement cuts. Sales staff warned supervisors (who reported to defendant Morgan) that key

hospitals were demanding lower pricing and evaluating competitors. Internal forecasts reflected declining Pylarify margins and customer attrition inconsistent with defendants' public guidance. Despite these warnings, defendants touted upside potential by reaffirming optimistic projections and claiming that Lantheus' contracts and diversification would sustain growth.

33.    During the same February 26, 2025 earnings call, defendant Blanchfield stated that "PYLARIFY remains the clear number one utilized PSMA PET imaging agent" and that Lantheus was "confident [it would] maintain [its] market leadership and relative price premium, even amidst competitive pressures." Defendant Blanchfield further reiterated that "we are pleased with CMS' new payment policy."

34.    These statements were materially false and misleading because defendants knew, or were reckless in not knowing, that Pylarify's competitive position was deteriorating because the MUC reimbursement cut had materially reduced hospital margins, was forcing contract renegotiations, and was undermining Pylarify's pricing power. Internal sales data showed that Lantheus was already losing accounts in the Pacific Northwest due to supply failures by its nuclear-pharmacy partner PetNet, causing hospitals to switch to competitors. Weekly sales summaries distributed to defendant Morgan reported these losses and reflected mounting price discounts to retain business. By this time, defendants were approving discounts of up to 25% and multi-million-dollar rebates (such as a $4 million rebate to one institution) to preserve customers and market share.

**March 4, 2025**

35.    On March 4, 2025, during the TD Cowen Healthcare Conference, defendant Markison told investors that "what gives [him] confidence is the turn of the calendar year led to the full effect of our strategic contracts, contracts coming into effect. . . . [T]he vast majority of our customers are under [these] contracts." Markison described early-year disruption under CMS'

- 9 -

new reimbursement system as "a small percentage of our business" and stated that "things will begin to stabilize as we come out of the second quarter and the full effect of our contracts begins to level off in the marketplace."

36.    These assurances were materially false and misleading. Lantheus' so-called "strategic partner" contracts were non-exclusive and allowed customers to switch suppliers at will. By February-March 2025, defendants were receiving reports of contract renegotiations and customer attrition caused by the MUC reimbursement cut. In Los Angeles, customers were demanding price reductions to match a competitor's lower rates; in Seattle and Nevada, customers were leaving due to PetNet supply failures. Despite receiving these internal warnings and authorizing these concessions, defendants publicly asserted that "[t]he vast majority" of customers were locked into multi-year contracts and that competitive pressures were minimal. Those assurances were knowingly or recklessly false because Lantheus' contracting network was already fracturing and its pricing power was eroding.

**May 7, 2025**

37.    On May 7, 2025, Lantheus announced first quarter results that missed market expectations. Pylarify sales declined year over year, and defendants lowered full-year guidance. During the accompanying earnings call, defendant Morgan attributed the setback to "temporal competitive disruption among smaller non-contracted sites." Defendant Morgan further stated that "[w]e plan to maintain our market leadership, and will continue to work through these competitive pressures and grow volume and revenue in 2025."

38.    These explanations were misleading because defendants already knew the disruption was structural, not temporary. Internal data and field reports showed that contracts were being renegotiated, discounts were widening, and customer defections were spreading. Nor were the setbacks limited to non-contracted sites. Nonetheless, when these partial truths reached the

market, Lantheus' stock price fell approximately 23% on May 7, 2025, as investors questioned the Company's guidance and management's credibility.

**June 2025**

39.     On June 10, 2025, at the Goldman Sachs Global Healthcare Conference, defendant Markison claimed that "right now, our strategic contracts are in place to basically keep the account whole on that segment of the population that has – that change of reimbursement."

40.     A week later, on June 17, 2025, at the Truist MedTech Conference, defendant Markison boasted about "PYLARIFY, a true blockbuster agent achieving $1.058 billion in sales last year" and emphasizing that Lantheus "believe[s it has] the best agent" in the PSMA PET market.

41.     These statements were false.  By June 2025, Lantheus had lost major accounts, its average realized price was down double digits, and defendants were preparing to cut guidance again the following quarter.

**August 6, 2025 – The Truth Is Revealed**

42.     On August 6, 2025, Lantheus disclosed that Pylarify revenue had fallen 8% year-over-year, while volumes increased only 2% and price-mix fell 10%.  Defendant Markison admitted that "aggressive discounting by [competitors]" and "renegotiation of some existing strategic partnerships" had forced Lantheus to walk away from uneconomic volume.  Defendant Marshall acknowledged that "[c]ompetitive dynamics have driven the net price environment lower than expected."  Lantheus reduced its full-year revenue guidance to a range of $1.475 billion to $1.51 billion, down from the $1.54 billion to $1.61 billion forecast just six months earlier.

43.     These admissions confirmed what defendants had known and concealed since late 2024 – that Pylarify's pricing was eroding, its contract base was unstable, and Lantheus' forecasting processes were flawed.  Although CMS' MUC reimbursement applied to only about

one-fifth of Pylarify doses – those billed to traditional Medicare fee-for-service patients treated in hospital outpatient departments – it served as the reference rate for the entire market. Hospitals used the new $337-per-millicurie rate to demand contractual matching concessions and competitors leveraged it to deepen discounts. These cascading effects caused Pylarify's pricing pressure to spread across all payer segments and revealed that the Company's flagship product lacked the reimbursement insulation defendants had repeatedly claimed. Once investors recognized that Pylarify's margins and growth prospects were structurally weaker – and that management's prior assurances were unreliable – Lantheus' stock price fell nearly 29% in a single day, closing at $51.87 per share on August 6, 2025, down from $72.63 per share the prior day.

### LOSS CAUSATION

44.    During the Class Period, defendants' false statements and omissions operated as a fraud on the market by inflating the price of Lantheus common stock. When the truth about the Company's pricing, reimbursement, and forecasting failures was revealed, the artificial inflation was removed and the price of Lantheus stock declined, causing damages to plaintiff and the Class (defined below).

45.    The May 7, 2025 partial disclosure caused a significant drop in the price of Lantheus shares as investors learned that Pylarify's growth had stalled and that Lantheus' guidance was unreliable. The August 6, 2025 full disclosure caused a further, sharper decline after the market learned that pricing pressures were structural, guidance had been cut again, and the Company's diversification narrative had collapsed. The timing and magnitude of these declines demonstrate that the losses suffered by plaintiff and the Class were directly caused by the materialization of the risks defendants had concealed.

46.    Analysts immediately tied the May 7 and August 6 price drops to revelations about Pylarify's structural pricing pressure and contract renegotiations. Event-study analysis will show

those declines were statistically significant at conventional confidence levels and directly linked to the corrective disclosures.

47.     The causal connection between defendants' misrepresentations and investors' losses is further confirmed by the temporal proximity and magnitude of the May 7 and August 6 price declines and by the analysts' immediate attribution of those losses to revelations regarding Pylarify pricing and contracting problems.

## PRESUMPTION OF RELIANCE

48.     At all relevant times, the market for Lantheus common stock was an efficient market for at least the following reasons:

(a)     Lantheus common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient, national stock market;

(b)     as a regulated issuer, Lantheus filed periodic public reports with the SEC;

(c)     according to the Company's Form 10-Q for the quarterly period ended June 30, 2025, Lantheus had approximately 67.9 million shares of common stock outstanding as of August 1, 2025.  During the Class Period, on average, more than one million shares of Lantheus common stock traded on a daily basis, demonstrating an active and broad market for Lantheus common stock;

(d)     Lantheus regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures;

(e)     Lantheus was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period and each of these reports was publicly available and entered the public marketplace; and

(f)      unexpected material news about Lantheus was rapidly reflected in and incorporated into prices for Lantheus common stock during the Class Period.

49.      As a result of the foregoing, the market for Lantheus common stock promptly digested current information regarding Lantheus from publicly available sources and reflected such information in the price of Lantheus common stock.   Under these circumstances, all purchasers of Lantheus common stock during the Class Period suffered similar injury through their purchases of Lantheus common stock at artificially inflated prices, and a presumption of reliance applies.

50.      A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on defendants' material omissions.   Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### CLASS ACTION ALLEGATIONS

51.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons that purchased Lantheus common stock during the Class Period and were damaged thereby (the "Class").   Excluded from the Class are defendants, the Company's officers and directors at all relevant times, as well as their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

52.     The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  Throughout the Class Period, Lantheus common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff, Lantheus reported over 67.9 million shares of common stock outstanding as of August 1, 2025 and Yahoo!Finance reports at least 641 institutions hold Lantheus shares.  Record owners and other Class members may be identified from records maintained by Lantheus or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.  Accordingly, plaintiff reasonably believes that there are hundreds, if not thousands, of Class members.

53.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the federal securities laws as alleged herein;

(b)     whether the price of Lantheus common stock was artificially inflated during the Class Period; and

(c)     the extent of injuries sustained by the Class members and the appropriate measure of damages.

56.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in managing this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

57.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

58.     Section 10(b) of the 1934 Act provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange –

*          *          *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. §78j(b) (footnote omitted).

59.     SEC Rule 10b-5 provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5.

60.     During the Class Period, defendants engaged in a plan, scheme, and course of conduct that was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and the Class, as alleged herein; and (ii) cause plaintiff and the Class to sell Company common stock at artificially depressed or deflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, defendants, and each of them, took the actions set forth herein.

61.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon plaintiff and others similarly situated in connection with their sale of the Company's common stock.

62.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class suffered damages in connection with their respective sales of the Company's common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

63.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

64.     During the Class Period, defendants acted as controlling persons of Lantheus within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, the Individual Defendants had the power and ability to control the actions of Lantheus and its employees.  Lantheus controlled the Individual Defendants and its other officers and employees. Defendants each participated in and are culpable for and by virtue of the acts alleged herein.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and plaintiff's counsel as Lead Counsel;

B.     Declaring that defendants are liable pursuant to the 1934 Act;

C.     Awarding damages in favor of plaintiff and the Class against defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.     Awarding plaintiff and the Class reasonable attorneys' fees, costs, and expenses incurred in this action; and

E.     Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 5, 2025                ROBBINS GELLER RUDMAN & DOWD LLP
                                       CHAD JOHNSON
                                       NOAM MANDEL
                                       DESIREE CUMMINGS
                                       JONATHAN ZWEIG


                                                  s/ Chad Johnson
                                       _____
                                                 CHAD JOHNSON

                                       420 Lexington Avenue, Suite 1832
                                       New York, NY  10170
                                       Telephone:  212/432-5100
                                       chadj@rgrdlaw.com
                                       noam@rgrdlaw.com
                                       dcummings@rgrdlaw.com
                                       jzweig@rgrdlaw.com

                                       Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

INDIANA PUBLIC RETIREMENT SYSTEM ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      (a)      Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

> *Woldanski v. TuSimple Holdings, Inc.*, No. 1:22-cv-09625 (S.D.N.Y.)
> *In re Silvergate Capital Corp. Sec. Litig.*, No. 3:22-cv-01936 (S.D. Cal.)
> *Henry v. Futu Holdings Limited*, No. 2:23-cv-03222 (D.N.J.)
> *Lemm v. New York Community Bancorp*, No. 1:24-cv-00903 (E.D.N.Y.)
> *In re Agilon Health, Inc. Securities Litigation*, No. 1:24-cv-00297 (W.D. Tex.)
> *Roofers Local No. 149 Pension Fund v. GSK plc*, No. 2:25-cv-00618 (E.D. Pa.)

(b)      Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

> *City of St. Clair Shores Police and Fire Retirement System v. Lineage, Inc.*, No. 2:25-cv-12383 (E.D. Mich.)

(c)      Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

> *Indiana Public Retirement System v. Rivian Automotive, Inc.*, No. 2:24-cv-04566 (C.D. Cal.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 31st  day of  October         , 2025.

INDIANA PUBLIC RETIREMENT SYSTEM

By:  *Jeffrey M. Gill*
Jeffrey M. Gill, General Counsel

LANTHEUS

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 12/20/2024 | 70 | $89.29 |
| 02/25/2025 | 2,500 | $80.05 |
| 02/25/2025 | 5,725 | $79.24 |
| 02/25/2025 | 10,788 | $79.25 |
| 02/25/2025 | 15,075 | $79.99 |
| 02/25/2025 | 28,412 | $79.99 |
| 03/19/2025 | 140 | $103.28 |
| 03/21/2025 | 85 | $97.71 |
| 03/27/2025 | 31 | $97.04 |
| 03/31/2025 | 31,000 | $97.77 |
| 05/07/2025 | 10,000 | $81.79 |
| 07/22/2025 | 60 | $72.34 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 03/13/2025 | 27 | $100.08 |
| 06/27/2025 | 710 | $81.49 |

Prices listed are rounded up to two decimal places.

*Opening position of 4,376 shares.